| | |
|---|---|
| **El Paso County, CO  _X_  District___County**<br>Court address: **270 South Tejon Street**<br>**Colorado Springs, CO 80903**<br>Phone Number: **(719) 452-5000** | DATE FILED: July 17, 2020 8:19 AM<br>FILING ID: 2FAFC833936FE<br>CASE NUMBER: 2020CA1240 |
| THE PEOPLE OF THE STATE OF COLORADO<br>Plaintiff<br><br>v.<br><br>KENNETH GLAD<br>Defendant | **Court Use Only** |
| Attorney or Party without Attorney<br><br>Susan Chadderdon, Esq.          Attorney for the People<br><br>Summer Woods, Esq.            Attorney for Defendant | Case Number: 20CR1194<br><br>Division: 10 |
| **TRANSCRIPTIONIST'S TRANSCRIPT** | |

    The following hearing was held on April 16, 2020 before The Honorable Erin Sokol, District Court Judge of the El Paso County Combined Court.

    This transcript is the Hearing on Bond in its entirety as requested by the Summer Woods, Esq. - Colorado Springs Public Defender's Office.

                                Andrew Maestas, Transcriptionist
                                D&H Transcription Services, LLP
                                P.O. Box 964
                                Colorado Springs, CO  80901

**This transcript is the work product of D&H Transcription Services, LLP, and may not be reproduced, by any means, without prior written consent pursuant to C.R.S.§13-5-128 and in compliance with Colorado CJD 05-03.**

2

I N D E X

|  | PAGE |
|---|---|
| Case Called/Hearing Held | 3-18 |
| Transcriptionist's Certificate | 19 |

1

3

1       **(Case Called at 9:39:26 a.m. FTR recording time)**

2       MS. WOODS:  If the Court's ready, I can call Kenneth Glad.  He is

3   present in custody.

4       THE COURT:  This is Kenneth Glad, 2020CR1194 and 20M1332.

5   Welcome, Mr. Glad.  Mr. Glad appears here in custody with Ms. Woods

6   and I have Ms. Chadderdon for the people.  Welcome, Ms. Chadderdon.

7       MS. CHADDERDON:  Thank you, Judge.

8       THE COURT:  Mr. Glad is here for a hearing on bond.  I note that

9   bond hasn't been addressed before.  Mr. Glad has a $300,000 bond.  I

10  did spend some significant time reviewing the Motion for the Bond

11  Modification, as well as the people's response to the defendant's

12  Motion for Bond Modification, as well as the attachments to the

13  people's response, as well as the public defender's Reply to the

14  people's response to the defendant's Motion for Bond Modification.

15  There was an attachment there, which is a scholarly article, I will

16  note, from the Pre-Trial Justice Institute regarding unsecured bonds

17  and arguments to change legislation as I take it.  So, in any event, I

18  am ready to proceed when you are, Ms. Woods.  Let me ask, first, you

19  have a right to a public proceeding today and we are not able to have

20  the public in here today because of the COVID-19 pandemic.  Are you

21  willing to waive your right?

22      MR. GLAD:  Yes, I am, Your Honor.

23      THE COURT:  Okay, thank you so much.

24      MS. WOODS:  Judge, I am asking for a $25,000 bond in this case.

25  I would refer the Court back to the Motions I filed.  My primary

1  argument, besides the fact that Mr. Glad does have connections to the
2  community, he's lived here for a year and a half.  He does have very
3  strong family support.  His family lives in Utah, but they are very
4  supportive of him.  He chose to come out here to start over after his
5  prior sentence, but once he got here, he got a job, he has a place to
6  live.  My argument today is that the amount of bond requested in this
7  case, I don't understand the purpose of a higher bond.  I understand
8  the arguments for a bond, the reasons for it, why things are put in
9  place, but the only reason this is a $300,000 bond is because Mr. Glad
10 can't post it.  This is a no bond hold for Mr. Glad.  He will never be
11 able to post it.  If he was richer, if he had resources, he would be
12 able to post bond and be back in the community, and I don't think
13 anyone is going to assert that richer people are safer to the
14 community.  I don't think that's an argument Ms. Chadderdon is ever
15 going to make, but that's what a no bond hold here says; is that if
16 Mr. Glad was richer, fine, we can put him out there.  There's also no
17 evidence to support that a $300,000 bond or a $25,000 bond is safer.
18 There's no connection to monetary amount and community safety.  I
19 understand the allegations here are incredibly serious.  He is
20 presumed innocent of them, though, and I think that here, the $25,000
21 bond is something that he can post, so asking for anything higher is
22 simply saying, "I know he's poor.  I know he can't post.  It's a no
23 bond hold."  As I stated in my Motion, there was a mechanism for the
24 people to pursue a no bond hold here.  They had the option 96 hours
25 after his arrest to file for that.  If we'd gone to a hearing on that,

1  I could've questioned their evidence.  I could've raised issues and
2  all of that, but instead, he doesn't have the benefit of that due
3  process right.  He also now doesn't have the benefit of bond.  So, I
4  think here, in order to keep it this high is saying that we're okay
5  with the fact that bond, essentially, can be a farce here for no bond
6  holds.  And so, I'm asking the Court to give him an amount he can
7  post, which is $25,000 and to give him the right to pre-trial release
8  here.
9       THE COURT:  Ms. Woods, you've done a great job briefing these
10 arguments and I agree that our bond system has a lot of flaws.  I
11 don't think there's any Judge in this entire country who thinks that
12 it works appropriately.  I'm not a legislator.  I can't change the
13 legislation and essentially, your argument sounds to me like any
14 defendant should either have a no bond hold or be released because
15 they should be able to pay the bond they can afford, right?  That
16 doesn't make sense to me from the legislative scheme, what it's
17 intended to do.  It would – while your arguments make sense to me,
18 that's not what the legislation has aimed to do, to either have
19 someone on a no bond hold or release them because they can afford it.
20 So, while I really appreciate your arguments, I understand them and I
21 think they have a lot of merit, they are not supported by our
22 legislation at this time.
23      MS. WOODS:  Well, Judge, I do think the legislation has asked
24 Judges to consider someone's individual financial circumstances when
25 setting a bond.

6

1      THE COURT:  Yeah.

2      MS. WOODS:  There's also a million other things to set.  I didn't
3 ask for a PR bond and I know the Court probably knows that's very hard
4 for me to do, to appear and not ask for a PR bond, but I did that
5 because I respect the other considerations outlined in the statute.

6      THE COURT:  But you're still asking to set a bond at a point
7 where he would be released.  You're still saying it's either no bond
8 or it's release.

9      MS. WOODS:  I think I'm saying that one of the factors the Court
10 should consider is the financial ability of the defendant, his
11 individual…

12     THE COURT:  Of course, but that's one consideration.  And let me
13 re-read because I don't think Mr. Glad was here – and I'm sorry, Ms.
14 Chadderdon, I'll give you the opportunity to speak in a moment too.

15     MS. CHADDERDON:  It's okay, Judge.  Thank you.

16     THE COURT:  Ms. Woods is making very good arguments.  I just want
17 to make sure I vet them.  The Supreme Court of Colorado, Justice Coats
18 - he's the Chief Justice - has issued an opinion or a memorandum
19 regarding the COVID-19 pandemic and these sorts of issues.  With
20 respect to bond, he has said that the Courts of various counties and
21 districts of the state continue to work toward reducing the
22 populations of our jails, which is a high-risk environment for
23 spreading the virus.  There remains a clear need to detain some
24 criminal defendants in the interest of public safety and therefore,
25 jail populations cannot be reduced indiscriminately.  This is a case

1  of momentous proportions with respect to public safety.  In fact, it's
2  difficult to really imagine a case with more public safety
3  implications.  I completely understand your argument that Mr. Glad is
4  innocent and that is absolutely true and that these are just
5  allegations, but let me just highlight those for the record quickly.
6  He is charged with offering the victim, a stranger, a young woman, a
7  ride to work during – I believe it was during the bomb cyclone, is
8  that right?
9       MS. CHADDERDON:  Yes, Judge, it was snowing at the time.
10      THE COURT:  When she got in the vehicle, she realized the
11  defendant had his erect penis outside of his pants.  He was
12  masturbating.  He then proceeded to kidnap her, hold her at knife
13  point, force her to perform oral sex, and she only got away because
14  she jumped out of the vehicle going at least 40 miles per hour.  Video
15  surveillance exists to show her rolling out of the vehicle.  It's a
16  shocker that she is alive today given the allegations, understanding
17  they're allegations.  And then, on December 17th, 2010, in Salt Lake
18  County, Utah, the defendant pled guilty to another sexual offense,
19  unlawful sexual activity with a minor, a felony, a third-degree
20  felony.  And he served six years in the Utah state prison and is a
21  registered sex offender.  In addition, he has another case, 20M1332,
22  for indecent exposure involving masturbating in his car, and the
23  victim in that case picked the defendant out of the lineup; so did the
24  defendant (sic) in this case, whether it was 80 percent or 100
25  percent, it doesn't make any difference for bond arguments to me

1  today.  He is facing 16 to 48 years to life in prison for the F1.  It
2  is truly impossible for me to imagine many cases that would exceed the
3  public safety concerns that are presented by this particular case, and
4  I think this is exactly the kind of case that the Chief Justice Coats
5  is talking about with respect to bond arguments.  I also, again, just
6  reject the argument that either someone should have a no bond hold or
7  be released on a bond that they can afford.  That is not what our
8  legislation has set out to accomplish and it's not for me to test that
9  legislation or to disagree with the legislation.  It is what it is.  I
10 am Ordered to follow the law.  So, okay.  There are my concerns.  Ms.
11 Chadderdon?
12      MS. CHADDERDON:  Just to clarify the record, quickly.  The
13 potential sentence for the F1 is life in prison.  The potential
14 sentence on the F2 sex assault is (inaudible) to 48, but I think the
15 Court just misspoke and I wanted to clarify that for the record.
16      THE COURT:  I'm sorry, that's what I meant to say, and I didn't
17 know I misspoke, so thank you.
18      MS. CHADDERDON:  It's fine, Judge.  I suppose I would stand on
19 the basis of the Motion.  I will say that in defense's Reply, they
20 stated that there is no reason for the $300,000 bond.  Judge Miles
21 reviewed this case at TV court, and we actually – the people – we
22 asked for a higher bond and the Judge was given the information about
23 his previous criminal history, about the type of case, and he was the
24 one who, in his discretion, set the case at a $300,000 bond.  So, in
25 essence, it's already been reviewed by a Judge and Judge Miles was the

1  person who decided that $300,000 was an appropriate amount.  With
2  regard to defense's argument that it's essentially the equivalent of a
3  no bond hold, I think – I agree with the Court.  The statute doesn't
4  specifically – well – the statute doesn't specifically state to post a
5  bond that the defendant can pay and get out.  It gives the Court
6  guidance and a whole series of different factors to consider when
7  setting a bond.  So, I agree with the Court that it shouldn't just be
8  a no bond hold situation or letting somebody out.  The factors that
9  should be taken into consideration when setting the bond are the
10 defendant's history, his criminal history, the penalties that he's
11 facing in this particular case, what his community ties are, and those
12 are all of the different factors that are to be considered when
13 setting a bond, and that's why I think, in this case in particular, an
14 elevated bond is very appropriate.  It's appropriate based on the
15 nature of the charges and the allegations.  It's appropriate based on
16 the potential penalties.  It's appropriate based on the defendant's
17 aggravated criminal history.  And I would note for the Court that the
18 only community tie that defense can really state is that he's lived in
19 Colorado Springs for a year and a half and he has a job.  He doesn't
20 have significant family here.  He doesn't have – he didn't grow up
21 here.  All of his family is in Utah and those are the people he is
22 calling when he has an opportunity.  So, I think that based on the
23 factors that the statute lays out for the Court, that an elevated bond
24 is appropriate based on that sort of matrix of consideration.  So, I
25 do think that the bond is appropriately set based on Judge Miles'

1  setting the bond at $300,000, and I do think that a highly elevated

2  bond is particularly appropriate in this case.  And I will note, as I

3  noted in my Motion as well, the defendant is young.  I'm not aware of

4  any aggravated or concerning health issues that he has.  I think if

5  there was ever a case that was appropriate for an elevated bond, it

6  would be this one, Judge.

7       THE COURT:  Okay.

8       MS. WOODS:  Judge, if I could just briefly respond.

9       THE COURT:  Okay.

10      MS. WOODS:  I would just note I agree the legislator has not put

11 the statute where I want it to be, where I think a lot of us would.  I

12 would note that 16-4-103 notes that people should be presumed to be

13 released.  The presumption in Colorado is for release.  And I think

14 the presumption that is countered by all of these factors, and there's

15 nothing in the statute that says, "Worse case, worse criminal history

16 equals higher bond."  What it says is that the Court should impose all

17 methods of bond and conditions of release to avoid unnecessary pre-

18 trial incarceration.  And so, I think here, the appropriate response

19 would be to lower the bond because the Court isn't saying the bond

20 should be set – if it's an F1, it should be set this high; if it's an

21 F2, it should be set this high.  In fact, that's been found to be

22 unconstitutional.  I think what the statute is trying to say is people

23 should be released under the least restrictive means necessary for

24 them.  So, here, with Mr. Glad, what I proposed in my Motion is a

25 $25,000 bond with ankle monitoring.  He is willing to stay in his

1  house as part of that condition as well.  I think the purpose of the
2  statute, as it stands, is to put release in place with conditions
3  necessary to combat the serious concerns the Court has noted and I
4  don't think the proper solution here is a $300,000 bond.  I think it's
5  a $25,000 bond with ankle monitoring and the conditions, if necessary,
6  that he stay in his home besides going out for medical things, or
7  groceries, or something like that.  That's all I wanted to add.
8       THE COURT:  Okay, I really appreciate it.  Well, I have
9  considered the argument of counsel, which were, again, laid out in a
10 large stack of writing, which I have read in detail.  I very much
11 appreciate your efforts on this.  I also have considered each and
12 every statutory guideline that's set forth in the bond statutes.  For
13 the reasons that I set forth before, there are numerous statutory
14 guidelines that Ms. Chadderdon has described as a matrix that I have
15 considered, which generally, almost all point in the direction of a
16 higher bond, but the one major concern here, and the prevailing
17 concern, particularly given Chief Justice Coats' directions to our
18 Courts is public safety.  It is almost impossible, again, for me to
19 imagine a more elevated public safety risk than the case that is
20 presented here, completely understanding that the defendant is
21 presumed innocent and that these are mere allegations.  The public
22 safety risk is extremely elevated and so, I do think a highly elevated
23 bond is appropriate in this case and I'm going to deny the Motion to
24 modify the bond.  It will remain at a $300,000 amount with all due
25 respect.  Do we have a future court date?

1          MS. WOODS:  We do, Judge.

2          MS. CHADDERDON:  Can I just – I apologize.  Can I update the
3    Court on the situation we had – when we discussed the deposition of
4    the victim's testimony, the Court stated that the Court would allow us
5    to depose her a week prior to her departure from the country.

6          THE COURT:  Yeah.

7          MS. CHADDERDON:  I spoke with her and I think there's some
8    complications to that and candidly, I'm not very sure how to go about
9    scheduling this and make sure that defense has enough time.  What she
10   explained to me is that the embassy has people on a waiting list and
11   essentially, they're queued and they're waiting just to allow people
12   to then be able to go back to Argentina.  Argentina's concerned about
13   people coming from the United States because we have a much higher
14   outbreak number than they do.  But essentially, what she said is that
15   you're on 24 hour standby notice, so they call you and within 24
16   hours, you have to be on a plane; that they tell you when and where to
17   go, essentially.  So, my concern is that I won't have the additional
18   warning of a week to tell the Court and to tell defense and to get
19   that scheduled because she may get a call one day and then, have to
20   leave the country 24 hours later.  So, I guess my request, at this
21   point, is that we do tentatively schedule a deposition maybe in mid-
22   May.  I don't even know if she'll be in the country at this point.  If
23   I get additional information, obviously, ahead on time, I'll give it
24   to the Court and to defense, but that's my request for now is to
25   tentatively schedule some kind of date so that we can work in that

1   direction because I'm afraid that I won't be able to comply with the
2   Court's Order with regards to scheduling it a week prior to her
3   departure.
4         THE COURT:  If only we all had a crystal ball.  I would imagine
5   we will have some kind of warning before flights start flying
6   internationally and borders start opening up.  I don't think that's
7   something where it's going to be, "Okay, this morning, everybody can
8   leave the country and start flying wherever they want to go."  I think
9   you're going to have warning about that.  My point in setting this out
10  as far as I possibly could was to give Ms. Woods the best opportunity
11  to prepare for her cross-examination if she is not able to actually
12  have the victim at trial in that circumstance; and if I were to allow
13  the deposition testimony, and so on, and so forth.  So, I mean, I
14  suppose what I could do is schedule it tentatively and then, if
15  there's no – make it conditioned on an announcement that the
16  international flights are – that allowing for that will be imminent
17  and then, if that is not on the horizon, if it looks like it's not
18  going to happen, you can't have the deposition, you have to delay it;
19  would that be helpful?
20        MS. CHADDERDON:  That would be helpful to me.  That would be my
21  preference is tentatively schedule it and then, we can vacate it if it
22  looks like she's not going anywhere.
23        THE COURT:  What do you think, Ms. Woods?
24        MS. WOODS:  I would maintain my objection to deposition.
25        THE COURT:  Of course.

1    MS. WOODS:  I would at least prefer that.  I appreciate what Ms.
2    Chadderdon is saying because that way, I can at least have an idea.
3    Otherwise, it sounds like I might have 24 hours notice to prepare
4    everything.
5    THE COURT:  Right.
6    MS. WOODS:  So, I think that if this is going to happen, I would
7    appreciate it this way with the idea that we could push it out so I
8    could at least have an idea of what is happening and what to prepare.
9    THE COURT:  Yeah.  Why don't I say to try to set it maybe the
10   week of May 11th, mid-May?
11   MS. CHADDERDON:  That's fine, Judge.
12   THE COURT:  And you all can figure out a time that works for you
13   and for the witness and do it mid-May.  And then, again, the caveat
14   there is if there's no imminent possibility that the borders are going
15   to open up and she's going to be flying, you need to delay it again.
16   And maybe you delay that week by week or something like that.  If that
17   makes you all more comfortable, please feel free to do what you need
18   to do to be able to schedule this, but again, with my goal being that
19   the defense has the best opportunity to prepare as possible and has
20   all the discovery that's available and maybe, DNA evidence, and
21   everything else.
22   MS. CHADDERDON:  Yes, Judge.
23   THE COURT:  Okay.
24   MS. CHADDERDON:  Is this something that we want to schedule off
25   docket or do we want to schedule it at the end of a docket day at this

1  point.  How does the Court want to proceed with that?

2       MS. WOODS:  I think off docket is probably better if that

3  wouldn't cause too much problems for Ms. Ader.

4       THE COURT:  Right.

5       MS. CHADDERDON:  And while the Court is looking at dates, Ms.

6  Woods had requested a number of specific discovery items,

7  surveillance, photo lineups, medical records.  I believe that we've

8  complied with all of that.  I think that everything has been

9  discovered.  Some of it may have been recently, so I don't know if Ms.

10 Woods has gotten it by today.  But if there is an issue or anything

11 that she's missing, I'd just ask defense to reach out to me, but I

12 think that we've complied with everything that we've previously

13 discussed.

14      MS. WOODS:  I'm missing a couple things still, but my

15 administrative assistant let me know that she's been having a lot of

16 problems with downloading discovery on her home server, so I was going

17 to wait to see if anything was coming in before I reached out to Ms.

18 Chadderdon, but I'm happy to reach out to her and tell her what I

19 think I'm still missing once I get the new batch in.  I haven't

20 received anything in over a week, so if she thinks there's been

21 something in the past week, I'll need to wait to check in to see

22 what's come in still.

23      THE COURT:  Okay.

24      MS. CHADDERDON:  Yeah, definitely, because I still had the lineup

25 and all of those various things, and that just came through a couple

1  of days ago, so I think it's probably – it's on its way to you.

2       MS. WOODS:  Perfect, thank you.  And I'll follow up with Ms.

3  Chadderdon if I think I'm still missing something else.  She's been

4  very helpful with getting stuff to me.

5       THE COURT:  Okay, great.  I'm looking at May 12th.  That week is

6  a domestic week, but I have four quick domestic matters in the

7  morning.  I should be available by 9:30 or 10:00.  How does that work

8  for you, May 12th?

9       MS. WOODS:  I'm very free.

10      THE COURT:  Ms. Chadderdon?

11      MS. CHADDERDON:  I can do May 12th, Judge.  That's fine.

12      THE COURT:  Okay, let's do that.  Let's do 10:00 on May 12th.

13 How long do you think you need?  All day?

14      MS. CHADDERDON:  I imagine it will probably be – most direct and

15 cross examinations of victims like this – usually about two hours –

16 maybe a little bit less, but that would be my approximate.

17      THE COURT:  Okay.

18      MS. WOODS:  That sounds fine.

19      THE COURT:  So, that's what we'll do; May 12th at 10:00 a.m.

20 Other court dates will remain.

21      THE CLERK:  The next court date is May 7th; did you want to move

22 that?

23      THE COURT:  What is?

24      THE CLERK:  The next court date is May 7th.

25      THE COURT:  Okay.

```
 1        MS. WOODS:  I was going to follow up with Ms. Chadderdon.  We're
 2   going to need more time on that.  We're still preparing a lot of
 3   mitigation to send to her.  So, I don't know if you want to…
 4        THE COURT:  Is that a prelim?
 5        THE CLERK:  It's arraignment.
 6        THE COURT:  Oh, arraignment.
 7        MS. WOODS:  …move that or how we want to handle that.  I was
 8   going to be asking for a continuation.
 9        MS. CHADDERDON:  The May 9th date?
10        MS. WOODS:  The 7th, yeah.
11        THE COURT:  May 7th.
12        MS. CHADDERDON:  May 7th, do you just want to get a new dispo
13   date now?  I'm sorry, I was having a little bit of a hard time hearing
14   you.
15        THE COURT:  May 7th is the current day.  Ms. Woods is asking for
16   a new disposition date, new arraignment date.  I don't care.  When do
17   you want to do that?  That would be fine.
18        MS. WOODS:  I'm working on getting reports and everything to put
19   something together for Ms. Chadderdon, so I'm going to follow up with
20   her about that, but if we could maybe push it a month to June.
21        THE COURT:  Yeah.
22        MS. CHADDERDON:  That's fine.
23        THE COURT:  June 4th at - actually, June 11th at 9:00 a.m.
24        MS. WOODS:  Thank you.
25        MS. CHADDERDON:  Okay.
```

1       MS. WOODS:  And then, we'll vacate the 7th?

2       THE COURT:  Vacate the 7th.

3       MS. CHADDERDON:  Yeah, and I'll just stay in contact with the

4  Court and Ms. Woods regarding the deposition date and whether that's

5  going to be necessary on that date or not.

6       THE COURT:  Okay.  So, we'll do a C&R to have Mr. Glad

7  transported for the deposition, but again, let's touch base.  Just

8  make sure you touch base with Ms. Ader a week ahead of time and we'll

9  just see what's happening.  I may ask you to push that back and we'll

10 just keep on pushing it back until you have the best opportunity to

11 prepare, okay?

12      MS. WOODS:  Thank you.  I think that's it for us.

13      THE COURT:  Okay, anything else, Ms. Chadderdon?

14      MS. CHADDERDON:  No, Judge, thank you.

15      THE COURT:  Okay, I appreciate it.  Thank you, Mr. Glad.  Thank

16 you, deputy.

17      **(Proceedings ended at 10:04:07 a.m. FTR Recording Time)**

1                    TRANSCRIPTIONIST'S CERTIFICATE

       The above and foregoing is a true transcript of the hearing in proceedings taken in the above-entitled case, which was digitally recorded in the El Paso County Combined Court at the time and place set forth above, which was listened to and transcribed to the best of my ability.

       Done this 11th day of June, 2020.


                                       /s/Andrew Maestas
                                       Andrew Maestas, Transcriptionist


                                       /s/Mary Ann Directo
                                       D&H Transcription Services, LLP
                                       P.O. Box 964
                                       Colorado Springs, CO  80901